UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

VICTORIA WILSON,

    Plaintiff,

v.                                        Case No. 8:17-cv-02739-T-02AAS

BADCOCK HOME FURNITURE,

    Defendant.
_____/

## ORDER

This matter comes to the Court on Plaintiff's Motion for Class Certification, Dkt. 56, and Defendant's Opposition, Dkt. 59. The Court also has before it motions to strike and exclude expert testimony. Dkts. 67, 69, 79. The Court **DENIES** the Motion for Class Certification and, in accord with its oral ruling on November 27, 2018, **DENIES** the motions to strike and exclude.

## BACKGROUND[1]

In 2013, Customer L. purchased furniture at a store in Tampa operated by Defendant. Dkt. 59-1 at 4. To make the purchase on credit, Customer L. provided personal information to Defendant, including his phone number. *Id.* at 5. Three

---

[1] To the extent the Court delves into the facts or merits of the case, courts are not only authorized but required to do so as necessary to resolve a request for class certification. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013); *see also Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1266 (11th Cir. 2009).

years later, Customer L.'s account became delinquent and Defendant made automated calls to the provided number to inquire about the debt. *Id.*

During the time frame of the calls, Plaintiff's grandmother was the subscriber of the number and Plaintiff was the user of the phone. Dkt. 59-4 at 10; Dkt. 59-5 at 3. The wireless carrier was Metro PCS/T-Mobile. Dkt. 59-4 at 14. Defendant called Plaintiff at least thirty times and left at least twelve pre-recorded voice messages. Dkt. 59-1 at 30; Dkt. 28 at ¶ 32; Dkt. 59-6 at 2.

Plaintiff claims she attempted to tell Defendant to stop calling, Dkt. 59-4 at 28, though her phone records show no outgoing calls to any of the numbers Defendant used to call Plaintiff's number or to the number identified in the voice messages as the call-back number, Dkt. 59-6 at 2. On November 15, 2017, Plaintiff picked up a call from Defendant for the first time and advised the caller that the number was wrong. Dkt. 59-4 at 35; Dkt. 59-1 at 30. Defendant has not called since then, although this lawsuit was served shortly thereafter. Dkt. 59-4 at 35; Dkt. 59-1 at 30.

Plaintiff filed her Complaint on November 13, 2017. Dkt. 1. She alleges violations of the Telephone Consumer Protection Act ("TCPA"), which prohibits "any person . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic

2

telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service . . . ." 47 U.S.C. § 227(b). The TCPA creates a private right of action for statutory damages in the amount of $500 per violation (or up to $1,500 if the defendant violated this subsection willfully or knowingly). 47 U.S.C. § 227(b)(3).

Plaintiff seeks to certify a class, which would include: "(1) All persons in the United States (2) to whose cellular telephone number (3) Defendant placed a non-emergency telephone call (4) using substantially the same system(s) that were used to telephone Plaintiff (5) from March 6, 2014 through the present and (6) where Defendant's call records report a wrong number associated with said cellular telephone number." Dkt. 56 at 5. Defendant opposes the motion, arguing that Plaintiff lacks Article III standing and that the proposed class does not satisfy the requirements of the Federal Rules of Civil Procedure. Dkt. 59.

## DISCUSSION

As a preliminary matter, the Court is unpersuaded by Defendant's standing argument. *See Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1252-53 (11th Cir. 2015); *Florence Endocrine Clinic, PLLC v. Arriva Med., LLC*, 858 F.3d 1362, 1365-66 (11th Cir. 2017). Rather, the materials

before the Court show that Plaintiff was called by Defendant, thereby triggering the TCPA and an injury-in-fact for standing purposes.

As for the request to certify a class action, Rule 23(a) of the Federal Rules of Civil Procedure requires that: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy). Fed. R. Civ. P. 23(a). The party seeking certification "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

Plaintiff seeks certification under Rule 23(b)(3), requiring the Court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23 also "implicitly requires that the proposed class is

4

adequately defined and clearly ascertainable." *Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945, 946 (11th Cir. 2015) (internal quotation marks and citation omitted).[2]

The burden of proof for the above requirements rests on the proponent of the class. *Id.* (citation omitted). The Court finds that even if Plaintiff's purported class satisfies the four prerequisites of Rule 23(a), the Court has serious concerns about the proposed class's ascertainability and that questions of law or fact common to class members do not predominate over any questions affecting only individual members.

I. <u>The proposed class might not be clearly ascertainable.</u>

A class is not ascertainable unless the class definition contains objective criteria that allow for class members to be identified in an "administratively feasible" way. *Bussey v. Macon Cnty. Greyhound Park, Inc.*, 562 F. App'x. 782, 787-88 (11th Cir. 2014). This requires a "manageable process that does not require much, if any, individual inquiry." *Id.* at 787 (internal quotation marks and citation omitted). To this end, Plaintiff's expert, Anya Verkhovskaya, proposes first using

---

[2] In both her papers and at oral argument, Plaintiff challenged the applicability of *Karhu*'s ascertainment requirement. While the opinion is not published, it is persuasive. Furthermore, this is not the sort of case where factors militating against a heightened ascertainability requirement exist. *See, e.g., Mullins v. Direct Digital*, LLC, 795 F.3d 654, 658 (7th Cir. 2015) (finding Rule 23 has no ascertainability requirement because, in part, it would have "the effect of barring class actions where class treatment is often most needed: in cases involving relatively low-cost goods or services, where consumers are unlikely to have documentary proof of purchase").

5

reverse directory database vendors and subpoenas to cell phone carriers to identify those persons whom Defendant called, who are listed in Defendant's records as "wrong numbers." Dkt. 56-1 at 16-18. This proposal, however, seems to suffer several mechanical shortcomings.

At the most fundamental level, the parties' experts dispute the precise amount of "wrong numbers." Based on Plaintiff's analysis, Defendant made 8,253 calls marked as wrong number to 7,705 cellphone numbers. Dkt. 56-1 at 16 According to the defense expert, Jan Kostyun, the number of relevant calls is significantly lower than this. Dkt. 59-7 at 36-40. The dispute extends to whether it is even possible to identify the cell phone subscribers of the alleged wrong numbers. According to Defendant's expert, there is no public database of cell phone subscribers and private services are often inaccurate and incomplete, and even a carrier-by-carrier investigation would not ensure accuracy. Dkt. 59-7 at 13-19. Plaintiff's expert claims this is possible, though one of her chief sources is the unobservable, proprietary "black box" techniques of LexisNexis. Dkt. 59-7 at 264.

Be that as it may, the processing of the thousands of "wrong numbers" in Defendant's database is where the matter truly falls apart. Most glaringly, Plaintiff's method would not even have discovered Plaintiff as a class member because she is not the subscriber of the number and there is no identification of her

6

in the provided Metro PCS/T-Mobile records. Dkt. 59-6 at 1870-74. In fact, this expert encountered a similar problem in another TCPA case, *Goins v. Palmer Recovery Attorneys, PLLC*, 6:17-cv-654-Orl-GAP-KRS. Dkt. 59-7 at 18. There, despite her stated ability to ascertain the plaintiff as a class member, an individualized inquiry based on Ms. Verkhovskaya's own knowledge about the case was necessary to identify the plaintiff as the called party. Dkt. 59-7 at 17-19. While this is by itself not fatal, it does highlight a weakness in the proposal: Short of relying on a claimant's assertions, there is no way definitively to determine who actually answered the call from Defendant and stated "wrong number." *See Stalley v. ADS Alliance Data Sys., Inc.*, 296 F.R.D. 670, 679 (M.D. Fla. 2013) (denying certification where the court was "not been presented with reasonable methods for ascertaining the identity of the individuals who answered [the defendant's] collection calls").

Making matters worse, there are documented instances of more than one customer providing the same phone number. Dkt. 59-1 at 6; Dkt. 59-2; Dkt. 59-3. This "multiple hit" scenario means that a call to an otherwise consenting customer might be designated as "wrong number" simply because Defendant had intended to call—and asked for—the other customer who provided the number. Additionally, Defendant was able to contact by phone some of its customers at their provided

7

numbers after those numbers were initially designated as "wrong." Dkt. 59-1 at 6; Dkt. 59-2 at 2.

Plaintiff points out that the names obtained through subpoenas or reverse directory databases can be cross-referenced against Defendant's customer records and only names that appear on both lists will proceed to the next stage of the certification process.[3] Dkt. 56 at 13-14. This additional step would provide some indicia of reliability, here concerning the subscriber/user distinction, notably absent in other cases. *See, e.g., Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593-94 (3d Cir. 2012). Yet this precaution risks excluding otherwise appropriate members from the class.

Plaintiff also assures the Court that any discrepancies will be worked out by a subsequent self-attestation process of mailing notices and claim forms to the

---

[3] On a related point, it seems incongruous to rely on Defendant's records as infallible writ when they list a "wrong number," but to discard as untrustworthy those same records when they indicate that a number belongs to a Badcock credit customer (by definition consenting) who has defaulted. In any event, as Defendant points out, a call recipient's statement of "wrong number," as well as the simple act of Defendant listing a number as "wrong number" may not be admissible as a matter of federal evidence as proof of the matter asserted, even if the number is labeled as "wrong" in Defendant's business records. The unknown person answering on the phone was under no business duty to make that declaration, which is likely hearsay to prove the number was in fact wrong. *Cf. Eichholz v. Pepo Petroleum Co.*, 475 So. 2d 1244, 1245-46 (Fla. 1st DCA 1985) ("If the initial supplier of the information is not acting within the course of the business, the record cannot qualify for admission.") (citation omitted); *Benedetti v. Charter Commc'ns, Inc.*, No. 1:16-CV-2083 RLM-DLP, 2018 WL 2970998, at *2 (S.D. Ind. June 13, 2018) (in a TCPA case, statement by caller that the call was on behalf of the defendant was hearsay to prove the truth of the matter asserted).

matched names and addresses, but the Court is skeptical. First, such a step ignores the very purpose of ascertainment and will, in any event, require an individualized inquiry. Secondly, while an affidavit certifying inclusion in a class might be appropriate in some cases where damages for an individual claimant are negligible, *see e.g.*, *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 667 (7th Cir. 2015), here Defendant could face up to $1500 per call. This amount is relevant both as an incentive for individuals to improperly enter the class and, as discussed more fully below, a danger that impacts due process protections for Defendant. *Karhu*, 621 F. App'x at 948-49 ("[A]llowing class members to self-identify without affording defendants the opportunity to challenge class membership provide[s] inadequate procedural protection to . . . [d]efendant[s] and implicate[s their] due process rights[, but] protecting defendants' due-process rights by allowing them to challenge each claimant's class membership is administratively infeasible, because it requires a series of minitrials just to evaluate the threshold issue of which [persons] are class members.") (alterations in original) (internal quotation marks and citations omitted).[4]

---

[4] In her Notice of Filing Supplemental Authority, Dkt. 101, Plaintiff directed the Court to the recently decided *Keim v. ADF MidAtlantic*, LLC, No. 12-80577-CIV (S.D. Fla. Dec. 4, 2018), which certified a class for a TCPA claim at docket entry 259. There the defendant's expert merely pointed out that phone carriers are under no obligation to maintain historical account records, not whether such information is obtainable at all. Secondly, the proposed solution of asking subscribers to provide user information once

9

It is worth mentioning that, as the class is most recently defined, the Court would not need to evaluate consent as a gatekeeping issue. By contrast, the original version limited the class to users from whom Defendant "did not have express consent to call said cellular telephone number," and a subclass of users who "had revoked their consent for [Defendant] to place such calls." Dkt. 28 at ¶ 54.[5] Perhaps realizing this would require the Court to make individualized inquiries at the ascertainment stage, Plaintiff restyled the class to its current form of "wrong number." But this only delays the necessary, fact-intensive inquiry into consent, as discussed below.

Notwithstanding the above points, a general reluctance by many courts to deny class certification because of administrative difficulties, even in ensuring that all members of a class are accounted for, gives the Court pause. Because the Court finds that predominance is not satisfied, however, this Court need not base its ruling upon, nor definitively resolve, the issue of ascertainment.

---

more leaves a defendant at the mercy of prospective class members. Lastly, because each phone number in *Keim* would only lead to one subscriber or user, there was no risk of a "multiple hit."

[5] This change in class definitions, done without formal amendment or leave, occurred after the June 13, 2018 deadline to amend the complaint. Dkt. 40. To resolve the present motion, the Court need not determine whether such a modification, which would not necessarily result in a "narrower" class, was proper. *See, e.g., Jacobs v. Quicken Loans, Inc.*, No. 15-81386-CIV, 2017 WL 4838567, at *4 (S.D. Fla. Oct. 19, 2017) (finding that changing class definition on the basis of arguments raised "would prejudice [the defendant] who conducted discovery and provided briefing based on the current class definition") (citation omitted). Plaintiff's initial expert report was based on the prior, foregone class definition.

10

II. <u>The common questions of law and fact do not predominate.</u>

To certify a class under Rule 23(b)(3), "the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." *Babineau v. Federal Exp. Corp.*, 576 F.3d 1183, 1191 (11th Cir. 2009) (citation omitted). "Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability . . . [and] will not predominate over individual questions if, as a practical matter, the resolution of an overarching common issue breaks down into an unmanageable variety of individual legal and factual issues." *Id.* (citation, alterations, and quotation marks omitted). The court in *Babineau* further noted that, in so deciding, courts should examine, among other things, possible defenses. *Id.*

Here, the common issues of fact and law do not predominate. The apparent common issues are few and straightforward: whether Defendant called the class members' phone numbers using a prohibited method and that the phone numbers were in some way incorrect. This analysis, though, neglects what is likely the determinative—and most complex, fact-specific—aspect of each case: how that number entered Defendant's records and, related, the issue of consent. *See Jacobs v. Quicken Loans, Inc.*, No. 15-81386-CIV, 2017 WL 4838567, at *2 (S.D. Fla.

11

Oct. 19, 2017) ("Pivotal to this analysis is whether [the plaintiff] has met his burden to show that the issue of consent for the challenged telephone calls can be resolved by common, classwide evidence or whether it is an individualized issue.") (citation omitted); *Shamblin v. Obama for Am.*, Case No. 8:13-cv-2428-T-33TBM, 2015 WL 1909765, *12 (M.D. Fla. Apr. 27, 2015) (denying class certification where "[i]ndividualized inquiries into consent (including where, how, and when) will predominate").

While it seems that, unlike in *Jacobs* and *Shamblin*, Defendant only obtains consent from customers in connection with a purchase on credit, Defendant could still demonstrate consent a variety of ways. *See Jacobs*, 2017 WL 4838567, at *2 (finding the plaintiff had not met burden where "issue of consent will require an examination of individual calls because consent is not limited to" one possible source). Undoubtedly Defendant called some wrong numbers. Yet it is quite likely that a defaulting customer may reply with "wrong number" when the customer answers a call from the creditor collecting a past-due debt. Or someone in the customer's household might intentionally mislead the caller on behalf of the defaulting customer. The call's recipient might also be bound by a customer's consent, like if a household member used the recipient's number to make a purchase. *See Osorio v. State Farm Bank*, 746 F.3d 1242, 1252-53 (11th Cir. 2014)

(finding that an agent could consent to calls under the TCPA on behalf of another individual). And, as evidenced by Defendants' records, the "multiple hit" scenario is not speculative.

The logic of Plaintiff's proposal to cross-reference names against Defendant's records to untangle the user/subscriber distinction does not extend to the consenting/nonconsenting distinction. Nor is Defendant listing "wrong number" in its records a proxy for no consent. While at this stage it is unclear just how many cases might implicate this or other defenses, it is important to note any inquiry's starting point: Rather than engage in random robocalling, Defendant only calls numbers in its records and its intent was to call actual known customers in arrears. Dkt. 59-1 at 3. *Actual* customers almost certainly consented. This means that Defendant would likely have a possible defense against many class members, the precise contours of which could vary substantially. The scope of this sort of inquiry is likely to dwarf the much simpler question of whether Defendant called a given class member with a prohibited system. This is not a case where a defendant sprayed robocalls across a nonconsenting public.

Finally, this case does not concern marginal damages for an ineffective, relatively cheap product as in *Mullins*; the TCPA carries with it damages of up to $1,500 per call. Plaintiff was called at least thirty times, which could total $45,000.

With such a looming threat, due process allows Defendant to inquire whether the alleged wrong number belonged to a customer by consulting each individual file and, if not, how the number entered Defendant's records, whether the claimant was actually the one called, whether privies or associates might have consented, and whether the call represents a "multiple hit." *See Karhu*, 621 F. App'x at 948-49.[6]

The facts presented here are distinct from the cases on which Plaintiff relies. In *Reyes v. BCA Fin. Servs., Inc.*, No. 16-24077-CIV, 2018 WL 3145807 (S.D. Fla. June 26, 2018), for example, the court granted certification, noting that, unlike in *Shamblin*, the defendant did not have actual proof of consent or that "consent could have been obtained in many different ways." 2018 WL 3145807, at *15-16; *see also Abdeljalil v. Gen. Elec. Capital Corp.*, 306 F.R.D. 303, 311 (S.D. Cal. 2015).

Though the Court does not yet address the issue of consent in the instant case, Defendant has put forth sufficient evidence that consent could present itself a variety of ways. And, as mentioned, because Defendant only calls phone numbers

---

[6] These same considerations might also preclude a finding that Plaintiff has satisfied the commonality requirement of Rule 23(a). *See, e.g., Shamblin*, 2015 WL 1909765, at *17 ("[The plaintiff's] ability to list some common questions does not satisfy commonality, because individualized proof will be required for each and every plaintiff, which defeats the purpose of class certification."); *Balthazor v. Cent. Credit Servs., Inc.*, No. 10-62435-CIV, 2012 U.S. Dist. LEXIS 182275, at *10, 16 (S.D. Fla. Dec. 27, 2012) (denying class certification on commonality and predominance because "[r]esolution of each putative class member's TCPA claim would necessarily involve an individual assessment of whether each class member consented to receive telephone calls on their cellular telephone"); *Hicks v. Client Servs., Inc.*, No. 07-61822-CIV, 2008 U.S. Dist. LEXIS 101129, at *20 (S.D. Fla. Dec. 11, 2008) (denying class certification on commonality because "consent is an issue that would have to be determined on an individual basis at trial.")

14

found in granted credit applications, the issue of consent would arise often. This fact distinguishes Plaintiff's case from *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674 (S.D. Fla. 2015) and its line of cases.

Simply considering what Plaintiff wants to do shows the problem: Plaintiff says first identify the "wrong numbers" listed in Defendant's calling records. That can be done. Plaintiff then claims her expert can divine the subscribers and affidavits can be mailed to those addresses to determine those with standing. For example, Plaintiff, an authorized user, is shown on no phone records but does have standing. But Plaintiff's grandmother, the subscriber and payer of the unlimited calling plan, has no standing. This determination is highly doubtful and the self-attestation process has been rejected by other courts. *See Karhu*, 621 F. App'x at 948-49. Worse yet, it ignores the real hole in this case: deriving consent. A mail-in affidavit for a $45,000 claim is not going to work in this class setting. Consent requires an individualized inquiry, especially when the source list, by definition, is consented as with credit applications.

Having determined that Plaintiff does not satisfy Rule23(b)(3), the Court need not address the remaining requirements. The requested class certification is denied. The motions to strike and exclude are denied for the reasons stated at the hearing.

## CONCLUSION

The Court **DENIES** Plaintiff's Motion for Class Certification, Dkt. 56, and the motions to strike and exclude, Dkts. 67, 69, 79.

**DONE AND ORDERED** at Tampa, Florida, on December 19, 2018.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
All counsel of record